FILED
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

2019 JUL -8 A 9: 39

DISTRICT OF UTAH

Aaron D.T. Needham
petitioner

v

State of Utah et al.

Case No. 2:15-CV-250

DEPUTY CLERK

Petitioner responds to
Defendant Roberts Summary
Judgment Motion

Honorable Clark Waddoup

    Petitioner pro se, Aaron Needham responds to Defendant Roberts
Summary-Judgment Motion and the Martinez Report filed:

## Jurisdiction

42 U.S.C § 1983 and 42 U.S.C § 12131-12165 provides that
no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be denied
the benefits of the services, programs or activities of a public
entity, or be subjected to discrimination by any such entity,
or be subjected to discrimination by any such entity under
Title II of American with Disabilities (ADA) see Tennessee v. lane et al
541. U.S. 509 (2004). Courts have previously held that this term
includes states prisons, see Pennsylvania Dept of Corrections v. Yeskey
524 U.S. 206, 210 (1998). In enacting the ADA, Congress "invoked
the sweep of congressional authority, including the power to enforce
the fourteenth amendment...." 42 U.S.C § 12101 (b)(4). Moreover,
the Act provides that "a State shall not be immune under
the eleventh amendmendment to the Constitution of the

United States from an action in a federal or state court of competent jurisdiction for a violation of this chapter § 12202. see Board of Trustees of Univ. of Ala. v. Garrett 531 U.S. 356, 363-64 (2001) also. U.S v. Georgia & Al 546 U.S. 151 (2006)

## Response to Motion

1. ... the ADA's purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C § 12101(b)(1) In following this National Mandate, the Dept. of Justice - Civil Rights Divisions issued the Title II Technical Assistance Manual Covering State and local Government programs and services. section 28 CFR § 35.172 makes it clear that the Act "does not require complainants to exhaust these administrative remedies". It is required that the States develop a grievance program, but, "Exhaustion of a public entity's grievance procedure is not a prerequisite to filing a complaint with either a federal agency or a court." AND The "ADA does not require complainants to exhaust administrative remedies prior to instituting litigation."

2. Dr. Roberts deliberate indifference is clearly and comprehensively established in his Martinez Report as Dr. Horani and Dr. Lobbs of IHC hospital clearly state in their reports that petitioner is to remain on 800 mg Fluconasole Indefinitely. The report shows that Dr. Roberts dropped the dosage to 200 mg. Regardless of the alleged consultation, Dr. Roberts produces no record by Dr. Horani reducing the dosage. affirming deliberate indifference.

3. Dr. Roberts discriminatory actions may be centered in the prison

A "State or local government may not discriminate against individuals or entities because of their known relationship or association with persons who have disabilities. This prohibition applies to cases where the public entity has knowledge of both the individuals disability and their relationship to another individual or entity. In addition to familial relationships, the prohibition covers any type of association between the individual or entity that is discriminated against and the individual or individual(s) with disabilities, if the discrimination is actually based on the disability. see 3.9000 also 28 CFR § 35.134

For these reasons, as further discussed, Petitioner respectfully request that Dr. Roberts motion be denied for Summary Judgment and the Court allow or grant the submission of material evidence in a rule 60 b motion combining other defendants

## Introduction
Dr. Roberts clearly states the undisputed fact that Needham is a paraplegic that required treatment for an extremely severe case of Coccidioidomycosis or Valley Fever. (Coccx)
Coccx that is primarily found in Southern-western State of the U.S. was originally discoured in the San Jauquen Valley of California where petitioner was born in 1968. The disease was discoured by Univ. of Utah in 1994 on petitioner right arm that required 800mg fluconasole. (Ex. A)
Upon arrival at Draper prison Dr. Roberts spoke with Dr. Horani, petitioners (Infectious Disease Specialist at IHC) to discuss treatment plan. Dr. Horani long term treatment plan was 800mg fluconasole indefinitely per the Martinez report and Dr. Clifford Schnueder of Univ. of Utah suggested 400 mg fluconasole.

Dr. Roberts alleges he followed the treatment plan that was deliberate indifferent to Dr. Horani plan and below the University of Utah of 400mg to adjust the dosage of medication providing symptom relief that caused unnecessary side effects.

Dr. Roberts identifies petitioners dissatisfaction in the reduction of medication and noted that petitioner filed grievances in 2013-2014, but misstates the time frame of those grievances.

Dr. Roberts misstates the side effects of the disease or his direct threat upon treating petitioners disease as the symptoms for the disease are (1) fatique, (2) night sweats, (3) pulmonary symptoms (cough inflamation of lung nodules, (4) chest pain, (5) dyspnea and hemoptyosis, (6) meninngitis, weight loss, head aches, (7) short term memory loss, (8) urinary tract infection. See Mayo Clinic and Infectious Disease Center Univ. of Arizona (2014) and bone and skin lessions

Identifying these side effects that eventually hospitalized petitioner in the infirmary for (4) four months on 10 to 12 I V treatment were the contributing factors that in March 2019 and put petitioner in the ICU at the Univ. of Utah were petitioner nearly died with blood pressure ranging in the 50/20.

Meeting with Dr. Goulston of Univ. of Utah Infectious disease in ICU, she proclaimed that I was dying and she did not know why. We had the (DNR) talk then she asked what I thought was wrong, I referred her to my medical records at IHC in 2009, thus she started the IV treatment plan.

One would think that a doctor would research the disease they are asked to treat before the patient dies or at least on the development of injuries.

Petitioner entered the prison with one sore on my

right toe that expanded to multiple injuries on both legs, loss of right kidney, bone and skin lesions that caused bone infections.

Petitioner alleges that Dr. Roberts was motivated in participating in Wayne Hohman discriminatory agenda that the State continues to manipulate as a State employee, Enhancing the effects of the disease challenging the competence of petitioners awareness at trial with clinical services. See 3.9000 also 28 CFR § 35,134 previously stated.

Accordingly, the case against Dr. Roberts should be granted

## FACTUAL BACKGROUND

1. Needham was first treated for the Disease at the Univ. of Utah Infectious Disease in 1996 to 2000.

2. Wayne Hohman threatened Needham and denied the renewal of his license in 2003 for being in a wheelchair as Hohman did not believe the disabled should be contractor for DOPL.

3. Hohman forced the signing of a stipulation and disclosed his discriminator belief.

4. Clement Tebbs in 2003 issued a Deed of Trust for a #100,000.- to complete the homes interfered with by Hohman and DOPL.

5. In 2004, Hohman files a complaint with DOPL of Nevada to continue to harrass petitioner.

6. In 2005, DOPL renews petitioners license by Kim Quoch.

7. In 2006 Clement Tebbs of BACT file a complaint at DOPL in NO. 29969.

8. In 2006, Petitioner with counsel meet with Holman, Gordon Summers and Kim Quoch at DOPL to discuss BACT Complaint and hand delivered Faux + Assoc- letter and audit to DOPL.

9. In 2006, fifth District Court Washington County dismissed Lis pendens filed by BACT on 18 projects of petitioners handled by counsel Faux + Assoc.

10. In 2007, Kim Quoch renews petitioners license and dismisses the BACT complaint. no. 29969 with counsel.

11. In 2008, Gordon Summers issues a complaint to Attorney General office for BACT complaint no. 29869 at DOPL

12. In 2008, Attorney General office Mark Shurtleff and Terry Powell file charges on

13. In 2010, Wayne Holman and Attorney General office, contact leonard McKnelly to convience him to testify against petitioner.

14. In 2011, Wells fargo violates the Bankruptcy Stay of petitioners personal home in refiance.

15. In 2012, Aric Cramer and Brock Karrington deny petitioners opportunity to appear at Reposition of Clement Tebbs

16. In 2013, petitioner trial where Terry Powell, AG Investigator testified that she subpoena Wells Fargo bank records and financial analysis that Wells Fargo responded too.

17. Petitioner is incarcerated at purgatory jail where petitioner is forced to sleep on the floor in a 5 by 8 foot cell having to crawl across the floor to use the bathroom and the conditions caused multiple injuries and pressure sores, but they provided 800mg of fluconasole.

18. Petitioner arrives at Draper prison taking 800mg fluconasole

19. Dr. Roberts consults with Dr. Horani and recieves 18 months of medical records that show Dr. Horani and Dr. Cobbs both prescribed a treatment plan of 800mg indefinitely. per the Martinez Report. (Ex B)

20. Dr. Roberts ignores the treatment plan and immediately chops the dosage to 200mg fluconasole - 75% of recommendation. (Ex. C)

21. As Dr. Roberts has declared on multiple occassions that he is unfamilar with the Disease, but claims he has the knowledge to know when someone is toxic but fails to provide any record proving the toxicity or that Dr. Horani changed his recommendation. (Martinez Report)

22. Since petitioner continues to struggle with the disease today and Dr. Roberts declares he has had titer test to check the toxicity that would require the adjustment for medication every three months, Dr. Roberts has not produced the 13 titer test that Dr. Roberts alleges he did.

23. Dr. Roberts Martinez Reports fall short as it only reflect October 2013 to December 2013 and he maintained employment through December 2016 that clinical services can produce 13 reports of the titer test being done and the symptoms he was trying to control has been concealed.

24. Dr. Roberts alleges he never discontinued Diflucan, but adjusted the dosage with consultation with Dr. Horani. But there are no records from Dr. Horani or Dr. Roberts in the Martinez Report to support this claim.

25. Dr. Roberts did provide trips to Univ. of Utah Wound clinic to repair his deliberate indifferent injuries caused by his manipulation of medication. Regardless of Dr. Roberts presciption or clinical services, injuries caused by the disease continue that hospitalized petitioner.

## Dr. Roberts and Clinical Services fraudulent Concealment of evidence.

26. Petitioner filed his first grievances in 2013 due to the reduction of medication, unsanitary conditions and lack of contact with family denied all phone calls to counsel by Elizebeth Lewis, Seargent Skinner and Officer Gordon.

27. As previously stated, under Title II of American with Disability the grievance process does not need to be complete to start litigation. But the State has yet to produce all of the grievance filed by petitioner and fraudulently conceal those facts that on November 15, 2016, Capt. Holladay, Leut Mason and Seargent Olin Knowingly and intelligently

removed all of petitioners legal documentations that they returned only fractions of the documents after four months of grievances. The state continues to with hold material evidence. See 42 U.S.C § 12101 (b)(1) and 28 CFR § 35. 172 (Ex. )

28. In 2014, petitioner filed a grievance to repair his personal wheelchair damaged by the poor roads and conditions of the prison.

29. In 2015, petitioner filed a grievance to repair the new personal wheelchair that the conditions of the prisons damaged.

30. As previously stated, petitioner filed grievances in 2013 and 2016 outlining the manipulation of medication, Med tech Bertram false accusation of cheeking a pill, Denial of access to mail, Denial to phone priviledges, denial of visits, Denial of exercise to the outdoor.

31. As previously stated, on November 15, 2016 Capt. Holladay, Lieut Mason and Seargent Olin removed all legal material from petitioner, removing only documentation and grievances that allow the state to create their own narrative.

32. Petitioner maintained copies of the grievances

9/36

Legal Standard
Summary Judgment

To survive a rule 12(b)(6) motion to dismiss, a complaint must set forth facts demonstrating a plausible claim for relief." Defeudis v. Wolfenden No. 2:13-CV-429-CW, 2013 U.S. Dist lexis 79069, at *2 (D. Utah June 6, 2014)(citing Bell Atl Corp v. Twombly 550 U.S. 544, 570 (2007). While a court will presume the truth of all well-pleaded facts in the complaint", it need not consider conclusory allegations" in determining whether a claim for relief is plausible. Id.

Dr. Roberts has the initial burden to establish the absence of material facts to support the non-moving party's claims. Jensen v. Kimble, 1 F.3d 1073, 1076 (10th Cir 1993)(citing Celotex Corp v. Catrett 477 U.S 317, 323 (1986)). In so doing, he (Dr. Roberts) may cite to particular parts of materials in the record supporting the fact, or may show that the cited materials "do not establish the absence ... of a genuine dispute or that an adverse party can not produce admissible evidence to support the fact." Fed R. Civi P. 56(c)(1)(A)-(B)

In responding to the motion, petitioner relies on designated specific facts showing there is a genuine issue for trial.

On review of a summary judgment or a pleading treated as a motion for summary judgment under rule 12(c), the party against whom the judgment has been granted is entitled to have all the facts presented and all the references fairly arising therefrom considered in a light most favorable to him. see English v. Kienke, 774 P.2d 1154 (UTAH CT App 1989) affd 848 P.2d, 153 (UTAH 1993).

The fact that the State withholds their grievances or provide incomplete copies of the grievances, petitioner will submit what copies he retained.

# Qualified Immunity

Qualified Immunity shields government officials who perform discretionary functions from § 1983 damages suits so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald 457 U.S. 800, 818)(1982)

When evaluating a qualified immunity defense, after identifying the constitutional right allegedly violated, courts must determine whether the conduct was objectly reasonable in light of clearly established law at the time it took place. See Anderson v. Creighton 483 U.S. 635, 639-40, 107 S.Ct 3034, 97 L.Ed 2d 523 (1987); Harlow v. Fitzgerald 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed 2d 396 (1982).

In Hope v. Pelzer, the Supreme Court emphasized;
for a constitutional right to be clearly established, its contour must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent. Id 536 U.S. 730, 739; 122 S.Ct 2508, 153 L.Ed 2d 666 (2002)

The court proceeded to discuss U.S. v. Lanier 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed 2d 432 (1997) which held that the "clearly established" prong of the qualified immunity analysis is identical to the "fair warning" standard....

Title II of ADA has clearly established guidelines that apply to State's and their employees., In a unanimous decision, the Supreme Court, in Pennsylvania Dept. of Corr. v. Yeskey 524 U.S. 206 (1998) stated explicitly that the ADA covers the operations of State prisons. It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which included, but are not limited too, proper medication and medical treatment, accessible toilet and shower facilities.... 28 CFR § 35, 152.

Two elements exist in the qualified immunity analysis— first, whether, under the facts alleged by plaintiff, the government officials violated a constitutional right and second, whether the right at issue was "clearly established" at the time of the defendants alleged misconduct...." Pearson 555 U.S. at 231 (Citing Saucier v. Katz 533 U.S. 194, 201 (2001)

Even if an official may have violated a plaintiffs rights, qualified immunity may be denied only "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded" that the actions were unconstitutional at the time, Malley v. Briggs 475 U.S. 335, 341 (1986). Thus, if at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates the right," the official is not qualifiedly immune. al-Kidd 563 U.S. at 741. Thus, the legal principle established by court decision must "clearly prohibit the officer's conduct in the particular circumstances before him." see Wesby v. Dist. of Colombia U.S. 138 S.Ct 577, 589 (2018). And a court must look to particularized facts of the case" upon which a plaintiff

relies before it may determine that the law is clearly established. Perry v. Durborow 892 F.3d 1116, 1124 (10th Cir 2018) (quoting White v. Pauly U.S. 137 S.Ct. 548, 552 (2017)

In this case, per Dr. Roberts Martinez Report, the report clearly showed Dr. Horani and Dr. Lobb's clearly stated that petitioner medication should be 800 mg Indefinitely and Clinical services showed three months of medication at 200 mg, deliberate indefferent to Dr. Horani treatment plan. Title II of the ADA clearly stated that the State and Dr. Roberts were responsible for the medication and medical care. see 28 CFR § 35.152 and Dr. Roberts deliberate indifference eventually caused loss of right kidney and continued bone and skin lesions.

In general, the Eleventh Amendment bars suits against a State unless it has waived its immunity or consented to suit, or if Congress has validly abrogated the States immunity. see Lujan v. Regents of Univ. of Calif (A.f. 3d 1516, 1522 (1st Cir 1995). Eastwood v. Dept of Corr. 846 F.2d 627, 631 (10th Cir 1988). Eleventh Amendment prohibits suits in federal court against a State by its own citizens or by citizens of another state) Here, Dr. Roberts violation of Title II of ADA in not providing the proper medication or medical care to prevent the multiple injuries caused by his action as a state employee, waiving his immunity protection that Congress has abrogated. The State entity defendants are arms of the State for purposes of sovereign immunity. Thus, the claims against Dr. Roberts and others are not precluded by Eleventh Amendment immunity, and the court does not lack subject matter jurisdiction to entertain them. Therefore, the claims must be granted pursuant to fed R. Civ P. 8 (a). see Ray v. McGill No. CIV-06-0334-HE, 2006 U.S. Dist. Lexis 51632 at *8 (W.D. Okla July 26, 2006) (citing Lujan v. Regents Univ. Cal 60 F.3d 1511, 1522 (10th Cir 1995)

The genuine issue of fact exist, Title II of ADA abrogates States immunity affirmed by Congress that Dr. Roberts ignorance in treating the Disease is no excuse for injuring a patient.

## LEGAL ARGUMENT

Needham is assertion of the Eignth Amendment violation described in the Martinez Report shows the deliberate indifference of Dr. Roberts and Clinical Services to ignore Dr. Horani treatment plan causing multiple skin lesions, pressure sores and injuries that Hospitalized petitioner for over a year.

Dr. Roberts alleges his consultation with Dr. Horani outlined an alternative plan for treatment but shows no record from Dr. Horani to the altered plan nor can Dr. Roberts justify the injuries that were preventive if he performed the titer test.

Title II of Americans with Disability Act and Protection and Advocacy for Individuals with mental Illness (PAIMI) Act are protection guidelines that create barriers or avenues for the disabled to show and hold State officials responsible for abuse.

Coccidioidomycosis Disease mental Illness is clearly defined by the Mayo Climic, National Institution For Infectious disease and University across the South West who are exposed to the Disease and in Title II of ADA.

On page 10 of the valley fever tutorial shows areas covered by the disease in the _Epidemiology_ that specific identifies southern Utah and Fresno County where petitioner was born. (Ex       )

The "spectrum of diseases leads to destructive lesions in the skin, bones, joints, meninges and virtually any other organ or tissue in the body to which the infection has spread." All of which, petitioner currently is medically battling with. (page 11 Ex       )

Dr. Roberts alleged excuses for being ignorant is treating the disease over five years. Dr. Roberts alleges he is not related to the current incarceration, legal access to the court or medical injuries caused by questionable medical care, but his reduction of medication, during October 2013 to July 2014 had a "direct effect" on petitioner's cognitive ability to be competent during the April 9, 2014 and May 30, 2014 proceedings.

In Dr. Roberts familial relationships, the prohibition covers any type of association between the individual or individual (s) or entity that is discriminated against and the individual (s) with disabilities, if the discrimination is actually based on disability Title II. 3. 9000 also 28 CFR § 35.134

Wayne Holman DOPL threatened petitioner in 2003 that he did not believe wheelchair individuals should be contractors. Thus, he filed complaints in 2004 at DOPL Nevada harrassing petitioner, is 2006 threatened to pull petitioner is prisoner for 20 years if he did not turn in his license. Eventhough Kim Quosoh DOPL renewed petitioners license in 2007, Holman had Gordon Summer file a complaint in 2008 to file charges at Attorney General office who filed a bogus probable cause statement and affidavit testifying to obtaining records through subpeona's docketed at the court that the court has no record.

The State assigns individuals to represent petitioner that operate under actual conflict of Inflict to with held exculpatory evidence with the States Brady violation that ultimately lead to a trip to Draper prisoner. But the discovery of a Brady violation required another proceeding.

The first hearing, petitioner had to be hospitalize a day after the hearing because of the disease and acute renal failure. (Ex.   )

Petitioner alleges Dr. Roberts intentionally chopped the dosage to enhance the sick effects of the causing a lowering of petitions competence to appear in court under fair conditions.

Dr. Horami specifiedstates that the treatment plan was to be 800mg. that during the eighteen month record, the dosage rose to 1200 mg but never dropped below 800mg under the care of an Infectious Disease Specialist.

Dr. Roberts who alleges ignorance of the disease drops the dosage to 200mg thus causing the effects of the Disease to be enhanced causing injuries that hospitalized petitioner.

Petitioner is constantly going to infirmary twice a day for four years to repair the injuries.

There is no reasonable juror that would not find Dr. Roberts intent to reduce the dosage debatable.

Dr. Roberts qualified immunity defense is only available to parties sued in their individual capacity. Moore v. City of Wynnewood 57 f.3d 924, 929 n. 4. (10th Cir 1995). Such an argument is misplaced because a government entity may not assert qualified immunity defense from a suit for damages. Owen v. City of Independence 445 U.S. 622, 654, 657, 100 S. Ct 1398, 63 L. Ed 2d 673 (1980). Therefore, petitioner must establish that the defendant's actions violated a federal constitutional or statutory right and ② that the right violated was clearly established at the time of the defendants actions." Greene v. Barrett 174 f.3d 1136, 1142 (10th Cir 1999). Our discussion in previous sections indicate the first prong of the qualified immunity analysis is satisfied by Needham's allegations that the State, through actions of Dr. Roberts violated

Needham's Eighth and Fourteenth Amendment rights by manipulating medications enhancing the effects of the disease giving the State an advantage in court while inflicting multiple injuries in violation of Title II of ADA. As Dr. Roberts and Clinical services actions against Needham at that time, there was ample law clearly establishing that their actions violated Title II of ADA act.

The PAIMI Act specifically states that continual egregious constitutional right violations warrant abuse. The challenged action need not have been previously declared unlawful, but it's unlawfullness must be evident in light of pre-existing law. Green 174 F.3d at 1142. This is generally accomplished when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff interpretation of the law. Id. The reduction of medications violated Title II & the ADA and PAIMI act.

   Needham Exhibits are copies showing a fraudulent concealment of material evidence

Petitioner retained copies of most documents, but on November 15, 2016 Capt. Holladay, Leut. Mason and Seargent Con in removed all of petitioners legal material returning those documents that allow them to create their own narrative.

for this very reason, the Dept of Justice implemented title II, 28 CFR 35.103 provides the following.

(a) Rule of Interpretation. Except as otherwise provided in this part, this part shall not be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act of 1973 (29 CISC § 791) or the regulations issued by federal agencies pursuant to that title

(b) Other laws. This part does not invalidate or limit the remedies, rights and procedures of any other federal, State or local laws (including State common law) that provide greater or equal protection for the rights of individuals with disabilities or individuals associated with them.

The ADA purpose of providing a clear and comprehensive National Mandate for the elimination of discrimination against individuals with disabilities "see 42 U.S.C § 12101 (b)(1). In following the National mandate of 28 CFR § 35.172 makes it clear that the Act "does not require complainants to exhaust these administrative remedies, and Exhaustion of a public entities grievances procedure is not a pre-requisite to filing a complaint with either a federal agency or a court." Also, the ADA does not require complainants to exhaust administrative remedies prior to instituting litigation." II.3.9000.

   It is frequently cited, the unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination. see Tennessee v lane 541 U.S. 509, 531 (2004). The Supreme Court held that title II of the ADA constitutes a valid exercise of Congress' enforcement power under the fourteenth Amendment is cases implicating the fundamental access to the courts. Tennessee Id a 531.

Therefore, Title II protects individuals from States who fraudulently conceal material evidence or use their administrative proper to direct a court with a narrative that is one sided.
   For over five years, Dr. Roberts and clinical service has been allowed to manipulate treatment that they allege is

to control toxity and they conduct test every[3] three months.
But their Martinez Report only shows three months
of Medical care, when Dr. Roberts cared for petitioner till 2016.
The report does not show the 13 test Dr. Roberts alleges
he performed to protect petitioner.

Petitioner alleges that Dr. Roberts was motivated by the familial
association to the State to attack petitioners disability that is
undisputed. Also, the only grievance filed to a Level III
was not the med tech's dispensing of medication.
Grievances were filed on

1) manipulation of meds (2013-14)                               (Ex 6   )
2) Damage to wheel chair (2015)                                (Ex     )
3) Injuries caused for failure to repair chair (2018)          (Ex     )
4) Captain Holloday removal of legal Material (2016)          (Ex     )
5) Dr. Roberts misdiagnosis of medication causing loss        (Ex     )
   of right kidney function (2016)

Regardless of the States asserts that the grievance, must
be exhausted prior to litigation, Congress has set the
Guidelines under Title II of the ADA that the grievance, does not
hinder litigation.

DR. ROBERTS Should be denied Qualified Immunity for his Deliberate Indifference.

The disputed evidence shows Dr. Roberts consulted with Dr. Horani, received (18) eighteen months of medical records showing Dr. Horani treatment with Dr. Lobbs was 800 mg Fluconasole INDEFINITELY.

Indefinitely defined by Webster as (1) not defining or identifying (2) not precise (3) having no fixed limit.

Dr. Roberts has produced no record verifying alleged toxicity warranting the reduction of the dosage showing the 13 test for titer that he claims.

But we do have a records of Dr. Roberts showing he Knowingly and intentionally reduced the dosage to 200 mg.

We also have a record from IHC that hospitalized petitioner a day after the trial for Coccidiodomycosis and acute renal failure. (Ex 2) showing the disease effected petitioner's competency.

With Two evidential hearings scheduled on April 9, 2014 and May 30, 2014 Dr. Roberts had an obligation to the familial to enhance petitioner's Disease to carry out Holman's threats.

The ban on cruel and unusual punishment contained in the Eighth Amendment requires prison officials to provide humane conditions of confinement including adequate food, clothing, shelter and medical care.... "Barney v. Pulsipher 143 f. 3d 1299, 1310 (10th Cir 1998). To State a cognizable claim under the Eighth Amendment for failure to provide medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence of deliberate indifference to serious medical needs." Estella v. Gamble 429 U.S. 97, 106 (1976).

Any Eight Amendment claim must be evaluated under an objective and subjective prong: "Was the deprivation sufficiently serious?" and if so, "Did the officials act with a sufficiently culpable state of mind?" Wilson v. Seiter 501 U.S. 294, 298 (1991).

Under the objective prong, a medical need is sufficiently serious" "if it is one that has been diagnosised by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Sealock v. Colorado 218 F.3d 1205, 1209 (10th Cir 2000)(quoting Hunt v. Uphoff 199 F.3d 1220, 1224 (10th Cir 1999)

Here, Dr. Horani offers an objective mandated treatment plan that he continues from Dr. Lobbs of IHC whose plan was 800mg Fluconasole Indefinitely. (Ex. B). This shows the recommendation by two specialist in Infectious Disease that mandate a treatment plan that by the time petitioner entered purgatory jail there was only one sore on my right toe. Due to the continued manipulation of medication by clinical service, (Ex. F ) shows the court my condition of my legs that continues after Dr. Roberts that he started

The subjective component requires the plaintiff to show that prison officials were consciously aware that the prisoner faced a substantial risk of harm and wantonly disregarded the risk "by failing to take reasonable measures to abate it..." Farmer v. Brennan 511 U.S. 825, 847 (1994).

Dr. Roberts assumes he was not deliberate indifferent eventhough he did not follow Dr. Horani recommendations who are specialist as Infectious Disease and Dr. Roberts predexes pro documentation from Dr. Horani altering his treatment plan or any

proof that petitioners titer test were showing he was toxic.

Dr. Roberts continues to allege that Univ. of Utah Infectious disease center was unfamiliar with Coccidioidomycosis disease is false as the University first treated petitioner for the disease in 1996.

Dr. Roberts alleges his treatment plan was done with a Infectious disease group who is unfamiliar with the disease and Dr. Horani as a specialist, but his altered plan did not reduce the injuries on my legs but increased them. Dr. Roberts did provide a air mattress, egg crate mattresses and extra blankets but it does not excuse the reduction of medication. that caused the enhancement of injuries.

This is not a matter of a dis satified employee or inmate or patient but a matter of fact, Dr. Horani provided Dr. Roberts a (18) eighteen month treatment that specialist in Infectious disease provided. Dr. Roberts alleges he consulted Dr. Horani and agreed to titer test every (3) three months. But Dr. Roberts Martinez Report only provides 3 months of record and no titer test that shows toxicity as there was only one completed and there is no record from Dr. Horani altering the treatment plan. So Dr. Roberts stands alone with Dr. Clifford Schneider of Univ. of Utah who altered Dr. Horani treatment plan by two Doctors who allegedly no nothing about Coccidioidomycosis Disease that then caused multiple injuries requireing mandatory trips to the wound clinic at the Univ. of Utah to maintain and repair the injuries. Even with this assistance, it did not stop the prevention of bone lesions or continued skin lesions.

Dr. Roberts actions were deliberate Indifferent to the needs of his patient resulting in multiple injuries that persist today and a Eighth Amendment violation.

Dr. Roberts exercised his considered medical judgment in decreasing the dosage to enhance the symptoms of the Disease temporarily assuming he could recover after the April 9, 2014 and May 30, 2014 hearing.

Needham can only state a cognizable §1983 claim against [Dr. Roberts] if he adequately alleges that Dr. Roberts and clinical services conspired with the State to violate his federal rights. See Am Mfrs Mut Ins Co v. Sullivan 526 U.S. 40, 49-50, 119, S. Ct 977, 193 L Ed 2d 130 (1999)(liability under §1983 requires showing that deprivation of federal right was committed under color of State law). Dr. Roberts direct interest was to the State as a member of Familial and acted in his official capacity as a medical professional treating Needham to knowingly reduce the medication that ultimately lead to the loss of the use of my right kidney. Liability under §1983 requires personal participation in the unlawful acts. Mitchell v. Maynard 80 F.3d 1433, 1441 (10th Cir 1996).

Even if Dr. Roberts stands in his individual capacity, he can be held liable under §1983 if he was a "willfull participant in the joint action with the state or its agents." Dennis v. Sparks 449 U.S. 24, 27, 101 S Ct 183, L6L6 L Ed 2d 185 (1980). Needham alleges that Dr. Robert exerted influence over clinical services at Draper prison so that his medical judgment was substituted for that of Dr. Horami treatment plan.

Dr. Horami treatment plan per Dr. Roberts Martinez Report was 800 mg a day of fluconazole, Dr. Roberts conclusorary allegations that he consulted with Dr. Horami convincing all parties to chop the dosage by 75%, even below the National recommendation between 400 mg - 800 mg. see CDC consl Infectous Disease Center, is unfounded.

Dr. Roberts presents no documentation from Dr. Horam supporting the lower dosage nor does he explained why he dropped the dosage for (9) nine months that happened to be during the remaining evidential hearing on April 9, 2014 and May 30, 2014. Results of Dr. Roberts decision can be seen in the pictures of Exhibit B.

Needham's Asserted Rights were clearly established under Title II ADA.

Finally, Needham shows that Dr. Roberts intentional and knowingly reduction of medication was supported by medical records reducing the dosage by 75%. But there are over five (5) years of medical records showing the injuries caused by his decision. (Exhibit f.). These pictures from the University of Utah Wound clinic show that clinical services was not able to get the disease under control in 2018. Petitioner spent 5 months in the hospital on IV treatment for 10 to 12 hours a day to finally get the disease under control.

Dr. Roberts is not entitled to Summary Judgment because the asserted rights by Needham are clearly established under Title II of ADA. In Pennsylvania Dept of Labor v. Yeskey the Supreme court clearly "stated explicitly that the ADA covers the operations of State prisons." Id. 524 U.S. 206 (1998) "Inmates can not leave the facilities and must have their needs met by the correction's system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate prisoners with disabilities, these individuals have little recourse, particular when need is great." As stated under 28 CFR § 152 the needs address of prisoners with Disabilities, which include, but no limited to proper medication and medical treatment . . . "

Title II of the American with Disability Act was and is clearly established such that Dr. Roberts for certain that his conduct was unlawful.

(Exhibit F) shows what happens when someone does not follow the treatment plan prescribed by someone who is a specialist. Pictures show from Univ. of Utah the result of lack of care.

Petitioner complained to Dr. Roberts that his modification of the dosage was not working and excused the injuries as part of the recovery process. Five years later, I am still burdened by the injuries.

As previously stated, _Pennsylvania Dept of Corr v. Yeskey_ 524 U.S. 206 (1998) stated explicitly that the ADA covers the operations of State prisons, and 28CFR §152 clarify the requirements in treating the disabled.

There is no reasonable juror that would not find this issue datable that the facts presented in Pennsylvania Dept of Corr v. Yeskey and the guidelines outlined in _Title II of the ADA - 28CFR §152_ were not followed by Dr. Roberts. That every reasonable official is on notice that their conduct is for certain in violating the Eighth Amendment when their deliberate difference produces a negative outcome.

Thus, Dr. Roberts is not entitled to qualified Immunity or a summary judgment.

Dr. Roberts is Not Entitled to Summary Judgment on Remaining ~~the Parties are entitled to summary~~ claims.

Petitioner is clearly stating that he alleges Dr. Roberts motive to reduce the dosage to 200 mg to enhance the effects of the disease for a (9) nine month period was to intentionally challenge the competence of petitioner for the April 9, 2014 and May 30, 2014 to obtain the same result at trial in 2013.

Petitioners legal disability under title II of the ADA see 42 U.S.C § 12132 (2014)

"Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

It is undisputed that petitioners legal disability are recognized in his medical records showing he is a paraplegic and battles with chronic Coccidioidomycosis. (Ex E)

Title II of ADA Defines the phrase physical or mental 28 CFR § 35.104 impairment includes, but is no limited to, such contagious and non contagious diseases and conditions as orthopedic, mental illness or emotional illness, neurological, musculo skeletal, respiratory, cardio vasular and digestive.

As previously stated the effects of the disease, when Dr. Roberts reduced the dosage to 200mg his decision had a effect on a non-contagious disease by enhancing its effects.

Petitioner alleges this is why the State fails to produce a record of only (3) three months and not the 39 months treatment period. This action violated Title II of the ADA and PAIMI Act whose role is to protect those with mental illness.

26/36

Dr. Roberts knowingly violated title II of ADA and PAIMI.

Petitioners current incarceration prejudice his position to use controlling case law. With limited resources, petitioner argues Dr. Roberts violation of ADA and PAIMI Act was intentional to carry out the conspiracy started by Wayne Holman. Title II of the Americans with Disability Act (ADA) protects the disabled from discrimination and deliberate indifference by public entities. The ADA Act defines "public entity" to include "any State or local government "and "any department, agency.... or other instrumentality of a state," § 12131(1)." "We have previously held that this term includes state prisons. see Pennsylvania Dept of Corr v. Yeskey 524 U.S. 206, 210 (1998). Title II authorizes suits by private citizens for money damages against public entities that violate § 12132 see 42 U.S.C § 12133. U.S. v. Georgia et al 546 U.S. 151 (2006). The ADA makes it clear that private citizens (inmates) can hold state officials liable for violating Title II.

First, petitioner identifies Dr. Roberts Deliberate indifference by Roberts failure to follow Dr. Herani (Infectious Disease specialist) who mandated 800 mg Fluconasole Indefinitely, that Dr. Roberts immediately reduced the dosage to 200mg at his own accord. Dr. Roberts alleges Dr. Herani agreed upon the medication reduction altering his own treatment plan and provides no record supporting such fact. (Ex. B). But the Univ. of Utah has over five years of medical records showing the results of Dr Roberts decision. Dr. Roberts actions to reduce the dosage to 200mg was deliberate indifferent to Dr. Herani recommendation.

Second, petitioner alleges Dr. Roberts actions were motivated by familial as associate to the State to assist in carrying

out Wayne Holman threat of Discrimination.

To State a claim of discrimination under the ADA Act, a plaintiff must show he is disabled, and otherwise qualified for benefits, and denied them "solely by reason of disability." Johnson v. Thompson 971 F.2d 1487, 1492 (10th Cir 1992). (Ex E )

It is impossible to know the inner thoughts of Dr. Roberts in why he reduced the medication, but Dr. Roberts was provided factual material showing petitioners "legal Disability" with Coccidioidomycosis and the record (Martinez Report) defines petitioners disabilities as a paraplegic. Here is a copy of petitioners IHC medical record from 2008 to 2013 that shows petitioner was hospitalized right after trial due to Coccidioidomycosis.(Ex. E )

Petitioner alleges Dr. Roberts Discrimination of disability was to recreate the mental Illness that gave the State an advantage at trial. Therefore, Dr. Roberts used Needham disability to discriminate against him in his medical professional.

Congress clarified the distorted view of being "otherwise qualified" for ADA protection when they provided a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. see 42 U.S.C 12101 (b)(1) see 42 U.S.C § 12132 et al seg. The definitions (28 CFR § 35.104) clearly define petitioners legal disability supported by medical records. (Ex. E ). Regardless of the States Martinez report, IHC documented petitioners "legal disability." (Ex E )

For this reason, doctor Roberts action to withhold medication or reduce the dosage was "deliberate indifferent to Dr. Horani treatment plan. This decision by Dr. Roberts was deliberate indifferent.

When Dr. Roberts chose to reduce the medication and provide 200 mg fluconasole, a 75% reduction in treatment because

the State an advantage at trial, he intentional discriminated against petitioners disability by failing to follow reasonable guidelines.

Petitioner alleges that when a public entity is deliberate indifferent to an individual with a disability and uses that disability to gain an advantage over them, this is disability discrimination.

The Protective and Advocacy for individuals with ~~disability~~ mental illness is apart of Title II of ADA Act 42 U.S.C § 12131 et seg that protects against discrimination.

Dr. Roberts assumption that the Mentally ill has no protection under Title II of ADA Act is misleading as congress went as far as to define mental illness as a disorder under 28 CFR § 35.104 and Pennsylvania Supra and Tennessee Supra hold entities accountable under title II of ADA. Therefore, Dr. Roberts violations of Title II of the ADA Act include the PAIMI act provide petitioner with a cause of action against Dr. Roberts.

Dr. Roberts joined Wayne Holman Conspiracy by his deliberate Indifference and disability discrimination

Needham holds Dr. Roberts liable for interferring with his treatment program designed by Dr. Lobbs and Dr. Horani who are specialist with infectious Disease who had five years to treat petitioner.

Dr. Roberts deliberate indifference alleging Dr. Horani altered his own treatment plan is questionable as a conclusory statement. With no facts to support Dr. Horani changes or record of the alleged 13 titers test showing petitioning

going toxic, Dr. Roberts conclusory statement that Dr. Horani altered the treatment plan is unfounded.

Without Dr. Horani as an excuse, Dr. Roberts stands liable for the injuries caused by his actions.

Liability under § 1983 requires personal participation in the unlawful acts. Mitchell v. Maynard 80 f.3d 1433, 1441 (10th Cir 1996)

1) Dr. Roberts personally spoke with Dr. Horani and received the treatment plan of 800mg INDEFINITELY of Fluconasole.

2) Dr. Roberts dropped the dosage to 200mg the first day.

3) Dr. Roberts placed James Edward Pfeffer #65044 with petitioner in the same cell who suffered from Chronne disease and dementia. Pfeffer bowels were out of control that he relieved himself every two hours some times whiping the feas on the wall or spreading it on the floor. that petitioner endured for (9) nine months.

4) Dr. Roberts refused to increase the dosage regardless of the diseases effects and injuries that developed.

5. Dr. Roberts did not maintain doing the titer test he claims he did over 39 months for 13 test nor has he produced the results of those test.

6. Dr. Roberts did visit with petitioner on October 16, 2013 to discuss medications and informed petitioner of his upcoming meeting with Dr. Horani

7. Dr. Roberts met with petitioner on October 20, 2013 reviewing the skin ulcers on petitioners legs.

8. On October 25, 2013 Dr. Roberts met with Dr. Horani by phone and decided to leave the dosage at 200mg because Dr. Roberts was afraid of toxicity due to the medication. This decision was based on Dr. Roberts lack of knowledge on how to treat the disease. Denise is pharmacy challenged the lower dosage and higher dosage.

9. Petitioner sent to see Dr. Clifford Schmeder of Univ. of Utah Infectious disease to review the disease, who later reported the dosage at <u>400 mg</u>. But Dr. Schmeder was confused on why petitioner was seeing him when Dr. Horami had already outlined a treatment plan. Dr. Schmeder recommended 400 mg fluconazole at the bottom range of the national average.

10. <u>On November 1, 2013</u> petitioner met with P.A. Coombs to review the injuries developing on each leg.

11. <u>On November 11, 2013</u> petitioner met with PA Dufford about the injuries to the legs.

12. <u>On November 15, 2013</u> petitioner met with Dr. Roberts to discuss the treatment plan at the wound clinic who was trying to repair the injuries caused by the reduction of meds. Dr. Roberts appeared to not understand why my legs continued to develop ulcers at the lower dosage of 200 mg.

13. <u>On November 17, 2013</u> Petitioner asked to speak with Dr Horami and was denied access.

14. <u>On November 19, 2013</u> petitioner requested of Dr. Roberts to call family. Dr. Roberts said it was a security issue and I needed to talk to officer skinner. Officer skinner referred me to office Gordon as case manager to resolve the issue, but officer Gordon was surprised I could not have access to the phones or mail.

15. <u>On November 21, 2013</u> frustrated with the development of skin lesions caused by the reduction of meds to 200 mg and having no contact with family for the Holidays, petitioner filed his first level I grievance. (Ex G)

16. <u>On December 19, 2013</u> petitioner denied level II grievance (Ex G)

17. January 14, 2019 petitioner files level III for denial of medication.
Petitioner went to St.George Utah to court the first week of
January 2014 that the fluconasole was stopped while I was
at court. Case No. 101500067 ( Ex G )

18. March 2014 petitioner went to St.George again for court that
was rescheduled with no fluconasole for a week. Case No. 101500067

19. April 3, 2014 petitioner went to St.George for court that was
rescheduled that medical provided no medication for court.

20. April 9, 2014 petitioner went to St.George with the State
again with holding medication for court. Case No 101500067

21. May 30, 2014 petitioner went to Cedar City for court that
was rescheduled with petitioner receiving no medications.

22. June 29, 2014 sentencing hearing again with no
medication in Cedar City City Court. Case No. 071500692

23. February 2014 petitioner requested to talk to his attorney
while in the infirmary that Elezebeth Lewis denied
who was case manager.

24. In July 2014, after both hearings were complete forcing
petitioner to move in to the appellate stage by creating
a level of incompetence caused by the lack of medication.

Dr. Roberts alleges he never discontinued medication, but if the
nurses do not provide the medication because they do not
receive an order for or the medication in the traveling packet

an inmate is denied their medication. Going (ten)days on [10]
each trip without meds for (5) times adds up to (50)fifty
days without medication only to return to a half starved
cellmate who whipped feas on the wall that needed to be cleaned.
Then, Dr. Roberts moves petitioner to an already condemed
part of the prison, per Bott v. Lund, where petitioner is housed
in a (STG) Severe Threat Group section in a cell that is less
then 6' x 9" Doubled cell. With no mobility to use the wheel
chair, petitioner was confined to two directions; into the cell
and out of a cell in Baker Block.

   After being threatened by the gangs to produce the pain pills
from medicals, petitioner was moved to Oquirrh 2 instead
of Oquirrh 5 with handicapp toilet available.

   Due to the lapse in medication and the reduction of fluconasole
to 200 mg the issues of the disease continued.

   Petitioner has in storage the grievances for the wheel chair
repair because petitioners property was sent to storage
in March 2019 when petitioner was hospitalized.

   Regardless of what Dr. Roberts excuses are for his
lack of education on treating the Disease, the disease continued
to get worse that clinical services continued to follow
his treat plan till March 2019 when petitioner was hospitalized
and sent to ICU at Univ. of Utah.

Dr. Roberts Tacit Agreement to the familial and Holman Conspir.

Dr. Roberts role in Holman's conspiracy to incarcerate petitioner is relative to his deliberate indifference in treating petitioner. He <u>first claims</u> that he reduced the dosage from 800mg to 200mg fluconasole due to toxicity but provides no record that toxicity existed.

<u>Second</u>, he claims Dr. Horani agreed to drop the dosage due to toxicity with no record of such an agreement.

<u>Third</u>. Dr. Roberts alleged he directed Aaron Douglass an Nurse to conduct a titer test every three months to determine toxicity. But Aaron Douglass is only a nurse and can not write orders to have such test performed that "only" Dr. Roberts or another doctor could do in ordering the 13 test.

<u>Fourth</u>. Dr. Roberts allege his reduction was caused by toxicity that there is proof, but the injuries on my legs and arm and both hips require weekly medical care to the Univ. of Utah that "any lay person would realize that they need to reinstate the dosage to 800mg pre-prescribed by a specialist in Infectous Disease.

Dr. Roberts and clinical service rational is not logical as their treatment plan has produced injuries requiring petitioner to be hospitalized for a year or twice a day dressing changes.

These actions by Dr. Roberts contributed to continual injuries for five years that the University of Utah records prove. (Ex. f )

The copies of the medication prescribed at 200mg were authorized by Dr. Roberts as identified in his Martinez report. (Ex C )

five: After filing grievances to repair petitioner personal chair, Dr. Roberts refused to repair the chair that resulted in petitioner falling to the ground (10) ten times before they finally produced a state wheelchair. Even using a misfited State chair did not not prevent injuries or prevent further injury.

The road conditions are rough and they break down the wheelchairs requiring constant repair having to go twice a day to the infirmary to change bandages over injuries caused by deliberate indifference. Thus, leaving petitioner without a personal wheel chair.

Six  Dr. Roberts withheld Neurotin due to false allegations by a med-tech Bertram is undisputed forcing petitioner to take Ibrophine instead that increased the likely hood of a Kidney injury that petitioner was already predisposed too.

Petitioner alleges Dr. Roberts actions are affirmatively linked to Wayne Hohman conspiracy by acts of deliberate indifference. Dr. Roberts was the head of Draper clinical services and made official policy to treat an inmate. A municipality can only be liable under § 1983 if it took "action pursuant to official policy municipal policy of some mature that caused a constitutional tort." Monell v. Dept of Soc. Servs 436 U.S. 658, 691, 98 S.Ct 2018, 56 L.Ed.2d 611 (1978). Clarification of Monell application is in Pembaur v. City of Cincinnati. states, "if the decision to adopt that particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official Government policy as that term is commonly understood." Id 475 U.S. 469, 106 S.Ct, 1292, 89, L.Ed.2d 452 (1986). The supreme court has noted that "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct casual link between the municipal action and deprivation of federal rights" Bd of County Commrs v. Brown 520 U.S.397, 404, 117 S.Ct 1382,

35/36

137 LEd 2d 626 (1997). In this context, "when an official municipal policy itself violates federal law, issues of culpability and causation are straight forward; simply proving the existence of the unlawful policy puts an end to the question." Barney v. pulsipher 143 f 3d 1299, 1307 (10th Cir 1998).

Dr. Roberts made the final decisions to define treatment plan with medication, replacement of wheel chair or without treatment. Dr. Roberts was the head of Draper clinical services and the final decision maker for the prison to decide if all 13 titer test were done to show toxicity levels or not.

Even the test provided in the Martinez report shows my toxicity was low providing evidence that Dr. Roberts theory that petitioner was toxic is unfounded.

## Conclusion

In West v. Atkins 487 U.S. 42, 108 S.Ct 2250, 101 L Ed 2d 40 (1988) the Supreme court stated "it is firmly established that a defendant in a § 1983 suit acts under color of law when [he] abuses the position given to [him] by the State while ... exercising [his] responsibilities pursuant to State law." Id at 49-50, 108 S.Ct 2250. Dr. Roberts possessed by virtue of State law and made possible only because [he] is clothed with the authority of State law. (quoting U.S. v. Classic 313 U.S. 299, 326, 61 S.Ct 1031, 85 L Ed 2d 1368 (1984).

Dr. Roberts role as head of Draper clinical services was the decision maker for the State whose policies and procedures were deliberately indifferent to the critical needs of petitioner's medical care.

Thus, the petition should be granted to move forward

June 18, 2019